# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**DANA LEE BLACK,**

      **Plaintiff,**

**v.**                               **Case No.: 3:16-cv-04421**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

      **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' briefs wherein they both request judgment in their favor. (ECF Nos. 12, 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**, (ECF No. 12); the Commissioner's motion for judgment on the pleadings be **GRANTED**, (ECF No. 15); and this case be **DISMISSED**,

**with prejudice,** and removed from the docket of the Court.

## I. Procedural History

On November 22, 2013, Plaintiff Dana Lee Black ("Claimant") protectively filed an application for DIB, alleging a disability onset date of October 1, 2012, due to "Seizures, degenerative disc disease, spinal stenosis, neck and back pain, [and], Severe Headaches," (Tr. at 180, 213). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 106, 116). Claimant filed a request for an administrative hearing that was held on September 9, 2015 before the Honorable Maria Hodges, Administrative Law Judge ("ALJ"). (Tr. at 36-79, 123). By written decision dated October 20, 2015, the ALJ found that Claimant was not disabled as defined by the Social Security Act. (Tr. at 18-30). The ALJ's decision became the final decision of the Commissioner on March 11, 2016 when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 9, 10). Thereafter, Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 12), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II. Claimant's Background

Claimant was 46 years old on his alleged disability onset date and 49 years old on the date of the ALJ's written decision. (Tr. at 29). He communicates in English and has a high school education with three additional years of college education. (Tr. at 212, 214). Claimant previously worked as a receiving/shipping clerk, supervisor in customer service,

supervisor in a juvenile facility, telemarketer, and maintenance worker. (Tr. at 41-45, 214).

III.   **Summary of the ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is

deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status requirements for disability insurance benefits through December 31, 2017. (Tr. at 20, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 1, 2012, his alleged disability onset date, through his date last insured. (*Id.*, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "epilepsy, degenerative disc disease, headaches, osteoarthritis, generalized anxiety disorder, and coronary artery disease." (Tr. at 20-22, Finding No. 3). The ALJ considered Claimant's alleged carpal tunnel syndrome in his left hand and neuropathy of the feet, but concluded that they were not medically determinable impairments. (Tr. at 20). Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 22-24, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform less than a full range of light work as defined in 20 CFR 404.1567(b). The claimant can occasionally climb ramps or stairs but never ladders, ropes, or scaffolds. The claimant can occasionally crawl. The claimant can frequently balance, stoop, kneel, and crouch. The claimant should avoid concentrated exposure to temperature extremes, humidity, vibration, and pulmonary irritants. The claimant should avoid all hazards. The claimant can do no commercial

driving or solitary work. The claimant can occasionally reach overhead with the left, non-dominant arm and frequently reach in all other directions with the left, non-dominant arm. The claimant can frequently handle and finger with the left, non-dominant arm. The claimant can understand, remember, and carry out simple instructions.

(Tr. at 24-28, Finding No. 5).

At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work (Tr. at 28, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 29-30, Finding Nos. 7-10). The ALJ considered that (1) Claimant was defined as a younger individual aged 18-49 on the alleged disability onset date (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 29, Finding Nos. 7-9). Given these factors and Claimant's RFC, with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that existed in significant numbers in the national economy. (Tr. at 29-30, Finding No. 10). At the sedentary exertional level, Claimant could perform unskilled work as an inspector or sorter, and at the light exertional level, Claimant could perform unskilled work as a routing clerk or price marker. (*Id*). Therefore, the ALJ found that Claimant was not disabled and was not entitled to benefits. (Tr. at 30, Finding No. 11).

## IV.    Claimant's Challenges to the Commissioner's Decision

Claimant raises two challenges to the Commissioner's decision. First, Claimant contends that the ALJ failed to conduct a proper credibility analysis. (ECF No. 12 at 4-5). According to Claimant, the ALJ erred by failing to consider the change in Claimant's symptoms over time, as required by Social Security Ruling ("SSR") 96-7p. (*Id*.). He

specifically states that the ALJ incorrectly assessed the severity of his neck and shoulder pain, chest pain with shortness of breath, and seizures. In addition, Claimant alleges that the ALJ's credibility analysis contained significant factual misstatements regarding Claimant's treatment history. (*Id.*). In his second challenge, Claimant argues that the ALJ failed to seek clarification of opinions given by his treating physicians with respect to how Claimant's epilepsy would affect his ability to perform work on a full-time basis. (*Id.* at 6). Within this challenge, Claimant references SSR 96-5p and maintains that the ALJ failed to consider the effect stress and fatigue had on his seizure disorder and failed to account for his post-seizure weakness and headaches. (*Id.*).

In response to Claimant's challenges, the Commissioner argues that substantial evidence supports the ALJ's credibility determination and evaluation of the medical opinions. (ECF No. 15 at 15-24).

## V.     **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The medical information that is most relevant to Claimant's challenges is summarized as follows.

### A.     *Treatment Records*

Claimant's records indicate that he suffered from a seizure disorder for many years prior to his alleged onset of disability. (Tr. at 415-26). In September 1997, Claimant's neurologist noted that he was "doing well" and his seizure disorder was improving with the use of Topamax and other medications. (Tr. at 415). At that time, Claimant was experiencing approximately three seizures per month. (*Id.*). His examination was otherwise unremarkable. (*Id.*).

Also prior to his alleged onset of disability, in 2007, Claimant had a percutaneous coronary intervention with a bare-metal stent. (Tr. at 315). In October 2011, Claimant saw his cardiologist, Skuli Gunnlaugsson, M.D, for the first time in over three years. (*Id.*). Dr. Gunnlaugsson noted that Claimant had been doing well following his coronary intervention until a month earlier when he started having chest pain upon exertion. (*Id.*). Claimant's cardiac examination was normal, but his EKG showed poor R-wave progression. (*Id.*). Dr. Gunnlaugsson felt that Claimant's chest pain was suggestive of unstable angina and scheduled him for a heart catheterization the following week. (*Id.*). The catheterization was performed on October 24, 2011 and showed normal left ventricular function with an ejection fraction of 60%. (Tr. at 327-28). The previously placed stent was patent. Distal to the stent was an area of 70% stenosis; the lesion completely resolved with the administration of intracoronary nitroglycerin. (Tr. at 328).

In September 2012, Claimant had a MRI of his cervical spine to evaluate a complaint of neck pain radiating to his left shoulder. (Tr. at 361). This study was compared to a March 2010 MRI and revealed no significant interval change. (*Id.*). The cervical vertebral body and disc heights were well maintained and the prevertebral soft tissues were within normal limits. (*Id.*). Claimant had mild degenerative changes and subtle broad-based generalized disc bulges from C3-4 through C6-7 that were similar in appearance to the previous study. (*Id.*). There was no discrete disc herniation. (*Id.*). He had mild exit foraminal narrowing on the left at C3-4 and on the right at C5-6 and a tiny rounded focus of increased signal intensity was noted within the cord at C5-6, but there was no evidence of severe stenosis of the spinal canal. (*Id.*).

The following month, Claimant was seen by neurosurgeon, Rida Mazagri, M.D, at Marshall Health. Claimant still complained of neck pain that radiated to his left shoulder,

which was associated with weakness, tingling, and numbness in his left arm and hand. (Tr. at 295, 298). He reported that his neck problem began in 2000 after he was assaulted by a "Vet in the hospital who tried to break his neck." (*Id.*). Claimant had problems "off and on" thereafter, but the pain was now worsening. (Tr. at 295). He also reported a history of a migraine headache. (Tr. at 297). Claimant noted that he had not taken any pain medication lately and indicated that he continued to have symptoms despite physiotherapy treatments. (Tr. at 298). On examination, Claimant was healthy looking and in no acute distress. (*Id.*). He had normal respiratory effort and denied any history of respiratory disorders. He admitted to having hypertension and a history of a heart attack, but denied chest pain. (Tr. at 296, 298). Claimant's muscle reflex and sensation examinations were normal, although his neck movement was restricted, more so on the left side. (Tr. at 299). Dr. Mazagri noted that the MRI of Claimant's cervical spine in September 2012 showed no fracture or destructive lesion and no significant interval change from his MRI in March 2010. (Tr. at 299, 300). Claimant had mild degenerative disc disease at C3-4, C4, and C5-6 on the left side and C5-6 on the right side, without evidence of major neural compromise. (Tr. at 299). Dr. Mazagri opined that Claimant's neck and shoulder pain were most likely related to cervical spondylosis. (*Id.*). He did not recommend surgery, but considered sending Claimant for nerve blocks if his symptoms persisted. (*Id.*).

In October 2012, Claimant followed up with Dr. Gunnlaugsson. He reported that he was doing "very well." (Tr. at 319). Claimant's history of coronary artery disease, status post percutaneous coronary intervention, and Prinzmetal angina was recorded. (*Id.*). Claimant denied experiencing any type of anginal chest pain, with the exception of one instance about four months earlier. Claimant took a Nitroglycerin pill at the time, and the

pain disappeared. (*Id.*). Dr. Gunnlaugsson prescribed atorvastatin for Claimant and told him to continue taking TriCor as it had been effective in lowering his triglycerides. (*Id.*). Claimant's EKG was normal. (*Id.*).

In May 2013, Claimant had x-rays of his left shoulder and cervical spine to again evaluate his complaints of pain radiating from his neck into his shoulder. (Tr. at 352-53). The films showed no evidence of fracture or misalignment of the shoulder. (*Id.*). Mild degenerative changes of the acromioclavicular joint were present, but there were no acute findings. (*Id.*). The x-ray of Claimant's cervical spine showed mild spondylosis, particularly involving the facet joints, with no acute findings. (Tr. at 353).

Claimant presented to his primary care physician, Rick Houdersheldt, D.O., multiple times in 2013. In March, Dr. Houdersheldt felt Claimant had symptoms of severe anxiety and hypertension, although his physical examination was normal. (Tr. at 338). In June, Claimant's review of systems and physical examination were normal; in November, he reported increased neck and shoulder pain; and, in December, his review of systems and physical examination were normal, except for some reported psychological symptoms. (Tr. at 335-37). Claimant was repeatedly advised to quit smoking. (Tr. at 336-37).

Claimant followed up with Dr. Gunnlaugsson in January 2014. Claimant stated that he was doing well overall, but was having "major problems with his back and [was] in the process of signing up for disability in that regard." (Tr. at 321). He stated that he sometimes experienced chest pain with diaphoresis when he had back and neck pain, but did not have any exertional chest discomfort. (*Id.*). Claimant appeared pleasant and in no acute distress. (*Id.*). His cardiac examination and EKG were normal. (*Id.*). Claimant's blood pressure was well controlled. (*Id.*). Dr. Gunnlaugsson concluded that Claimant's

chest pain was likely related to his back discomfort. (*Id.*). Still, Dr. Gunnlaugsson increased Claimant's dosage of atorvastatin and encouraged him to quit smoking. (*Id.*). The following month, Claimant saw Dr. Houdersheldt. Claimant reported "doing okay" and his review of systems and physical examination were considered to be within normal limits. (Tr. at 334).

In June 2014, Claimant presented to Robert L. Lewis, II, M.D., at Teays Valley Neurology for neck pain and seizures. As to his neck, Claimant described intractable pain that was not successfully treated with physical therapy or nonsteroidal anti-inflammatory drugs. Claimant indicated that his pain had worsened since his 2010 MRI. (Tr. at 383). Dr. Lewis diagnosed Claimant with neck pain, limb pain, cervical radiculopathy, spasmodic torticollis, and muscle spasm. (*Id.*). To treat the spasmodic torticollis, Dr. Lewis planned to administer a Botox injection. He also planned to begin trigger point injections. (*Id.*). Claimant was instructed to undergo an EMG to evaluate his shoulder pain. (*Id.*). No changes were made to his anti-seizure medications. (*Id.*).

The following month, Claimant presented to Dr. Houdersheldt and was advised that the MRI of his brain was negative for abnormalities. (Tr. at 394). Claimant noted that he was recently denied disability benefits and requested documentation to support his claim. (*Id.*). His review of systems and physical examination were normal. (*Id.*). Claimant also saw Dr. Houdersheldt in August 2014. Although he complained of continuing pain, his review of systems and physical examination were otherwise normal. (Tr. at 392).

In September 2014, Claimant saw Dr. Lewis for follow-up regarding his neck pain. (Tr. at 427). Claimant explained that his neck pain began on June 30, 2000; was constant; and affected his bilateral shoulder, left forearm, and upper back. Claimant reported having undergone physical therapy and having taken non-steroidal anti-inflammatory

medications, Tylenol, Lyrica, Neurontin, and Medrol kits without success. He stated that the pain had increased over the past four years and was sharp, stabbing, and throbbing. Claimant added that he had seen a neurosurgeon, but surgery was not recommended. (*Id.*). Regarding his "[c]omplex partial" seizures, Claimant described having fair results from medication, although he continued to have seizures up to five times per week. (Tr. at 428). He also reported chest pain, headaches, and muscle weakness. (Tr. at 430). For his neck pain and muscle spasm, Claimant planned to schedule trigger point injections and was prescribed a compounding cream; for his shoulder pain and spasmodic torticollis, he was awaiting Botox. (Tr. at 432, 441). To control Claimant's epilepsy, Dr. Lewis offered to increase Claimant's medications and/or schedule an amplitude-integrated EEG test, but Claimant elected to make no changes. (*Id.*). According to a recent MRI, there were no new findings related to cervical radiculopathy since the last MRI in 2012. (*Id.*).

In November 2014, Claimant saw Dr. Houdersheldt; his review of systems and physical examination were normal. (Tr. at 391). However, two months later, in January 2015, Claimant presented to Dr. Houdersheldt and reported being involved in a car accident earlier that month. (Tr. at 390). Claimant had been taken to the hospital, diagnosed with cervical strain, and sent home with prescriptions of Toradol and a muscle relaxant. He complained of new onset back pain that was worse on the left with radiation to the calf and increased neck and shoulder pain. (*Id.*). He stated that heat, ice, and Percocet were not helping the pain. (*Id.*). Dr. Houdersheldt's impression was cervical spondylosis/strain and low back strain. (*Id.*).

In February 2015, Claimant continued to complain of neck pain to Dr. Houdersheldt and stated that his low back pain was worse on that date. (Tr. at 389). Dr.

Houdersheldt diagnosed Claimant with degenerative disc disease, coronary artery disease, and tobacco dependence. (*Id.*). Finally, in August 2015, Claimant saw Dr. Houdersheldt and reported issues with his blood pressure and tingling in his feet. (Tr. at 387). Claimant's review of systems was otherwise normal, and his physical examination was unremarkable. (*Id.*).

### B.    *Evaluations and Opinion Evidence*

On November 21, 2013, Dr. Houdersheldt authored a letter stating that Claimant was diagnosed with, *inter alia*, spinal stenosis, osteoarthritis, degenerative disc disease, ischemic heart disease resulting in left heart catheterization, hypertension, bilateral upper extremity radiculopathy, and seizures. (Tr. at 303). He stated that Claimant's MRI showed multilevel degenerative disease with spondylosis and bulging discs, and Claimant also suffered from frequent severe headaches. (*Id.*). Dr. Houdersheldt opined that although Claimant had previously tolerated his pain with medication, his condition had progressed. Dr. Houdersheldt added that, in his professional opinion, Claimant could no longer work. (*Id.*).

On February 19, 2014, Deidre Parsley, D.O., performed a consultative internal medicine examination. Claimant reported to Dr. Parsley that he had psychomotor seizures that began at the age of 14 and that his last known seizure was 12 days earlier. (Tr. at 364). He stated that he had six seizures per week lasting 20 to 30 minutes each; they were usually preceded by a headache and followed by headache, fatigue, and other symptoms. (*Id.*). Claimant denied having any hospitalizations in the last two years related to his seizures. (Tr. at 365). He did not see a neurologist, but received Tegretol from his primary care physician. Claimant also reported having neck pain that began in 2001 after he was attacked by a nursing home patient where he worked. Claimant was taken off work

for a year at that time, and he received physical therapy and chiropractic care. He described his current symptoms as a sharp pain in the neck that radiated down the spine and into both extremities. He had intermittent numbness and tingling in his left arm and fingers. The pain increased with lifting, carrying, lying down, and with bending, extending, and rotating his neck. The pain was alleviated somewhat with Lyrica and Narco. (Tr. at 365). Claimant additionally complained of back pain, headaches, and chest pain. (Tr. at 365-66). The chest pain occurred three times per week and was brought on by exertion, but also could awaken him at night. (Tr. at 366). It typically subsided on its own, although he sometimes took Nitroglycerin, which provided relief within minutes. (*Id.*).

During his examination, Claimant was observed walking with a normal, steady gait, unassisted by aids, and he appeared to be stable at station and comfortable in a sitting position for 15 to 20 minutes, after which he stood to alleviate back and neck pain. (Tr. at 367). Claimant had no shortness of breath and no abnormalities on his cardiovascular examination. (Tr. at 368). Claimant's shoulders, elbows, wrists, and hands were not tender and were without redness, swelling, or warmth. He had no Tinel's or Phalen's signs. Claimant was able to write and pick up coins without difficulty, but his grip strength was 4/5. Claimant's lower extremities had no tenderness, redness, swelling, warmth, fluid, laxity, or crepitus. Claimant's cervical spine was tender, but without spasms. (Tr. at 369). His dorsolumbar spine was of normal curvature and showed no evidence of spasm. Claimant complained of tenderness on percussion in the upper and mid thoracic and the lumbar regions. He had a normal straight leg raise test in the sitting position, but the test was positive in the supine position on the left side. On neurological examination, Claimant's cranial nerves were intact. He had decreased muscle strength in

his left shoulder graded at 3.5 out of 5. Otherwise, the muscle strength in his upper extremities was "slightly decreased" at 4 out of 5. (*Id.*). There was no evidence of atrophy. Claimant's sensation was intact, except for the tips of the fingers on his right hand. His reflexes were symmetrical bilaterally. He had no clonus. Claimant could walk on his heels and toes, could perform tandem gait without difficulty, but could do only a one-half squat due to low back pain. In summary, Dr. Parsley opined that Claimant had some degree of impairment in sitting, squatting, and stooping, but no impairment in standing or walking. (Tr. at 371). He had mild impairment in bending and "possibly" mild impairment in lifting, carrying, pushing, pulling heavy objects and grasping, gripping, and handling objects. (*Id.*).

On March 19, 2014, Rabah Boukhemis, M.D., assessed Claimant's physical RFC based upon a review of Claimant's records. Dr. Boukhemis found that Claimant did not have any severe impairments and had non-severe impairments of minor motor seizures, spine disorders, and essential hypertension. (Tr. at 85). He found Claimant to be only partially credible as his "complaints appear[ed] to be a bit out of proportion when compared to the evidence in the file." (*Id.*). He opined that Claimant could perform work at the light exertional level with additional postural and environmental limitations, including occasional crawling and climbing of ramps, stairs, ladders, ropes, or scaffolds; frequent balancing, stooping, kneeling, and crouching; no concentrated exposure to extreme temperatures, wetness, humidity, vibration, fumes, odors, dusts, gases, or poor ventilation; and not even moderate exposure to hazards such as machinery and heights. (Tr. at 86-87). The environmental limitations were based on "[s]eizure precautions." (Tr. at 87). He opined that Claimant could work at light level occupations of acid filler, airline security representative, and assembler. (Tr. at 89).

On May 23, 2014, Narendra Parikshak, M.D., reviewed Claimant's records at the reconsideration level. His minor motor seizures and spine disorders were determined to be severe, although his essential hypertension and affective disorders were deemed non-severe consistent with Dr. Boukhemis's opinion. (Tr. at 98). Dr. Parikshak agreed that Claimant was partially credible and gave little weight to the medical opinions of Claimant's treating sources as the "medical evidence [did] not support them." (Tr. at 99-100). Dr. Parikshak agreed with Dr. Boukhemis's opinion of Claimant's RFC. (Tr. at 100-02).

On September 26, 2014, Dr. Lewis wrote a letter addressed to Claimant's attorney. He noted that Claimant was diagnosed with intractable epilepsy, cervical radiculopathy, spasmodic torticollis, muscle spasm, pain in limb, neck pain, and degenerative disc disease. (Tr. at 386). Dr. Lewis noted that he saw Claimant several times in his office and that Claimant had additional issues including, *inter alia*, frequent headaches, bilateral upper extremity radiculopathy, and spinal stenosis. (*Id.*). Claimant was currently on Keppra and Tegretol and was compliant with his medications. (*Id.*). Dr. Lewis opined that Claimant was not capable of working a forty-hour week and should be considered for permanent disability. (*Id.*). Further, Dr. Lewis stated that Claimant should not be driving, operating heavy equipment or machinery, or climbing ladders. (*Id.*). In addition, he should not work in a solitary environment, as stress and fatigue could exacerbate his seizure disorder, causing a hazard to himself and/or other employees. (*Id.*).

On August 26, 2015, Dr. Houdersheldt wrote a second letter in connection with Claimant's disability claim. Dr. Houdersheldt stated that Claimant was diagnosed with spinal stenosis, chronic sinusitis, osteoarthritis, degenerative disc disease, ischemic heart disease resulting in left heart catheterization, hypertension, bilateral upper extremity

radiculopathy, carpal tunnel syndrome, frequent headaches, seizures, epilepsy, and, most recently, neuropathy in his feet. (Tr. at 396). Dr. Houdersheldt stated that Claimant's psychomotor seizures were his "main concern at [the] time." (*Id.*). Claimant was currently taking pain management medications and an anticonvulsant regimen of Keppra and Tegratol. (*Id.*). He was compliant with his medications. (*Id.*). Dr. Houdersheldt opined that Claimant was "not capable of working a full time job" and that "[w]orking a forty-hour week should be considered a permanent restriction." (*Id.*). He advised that an employer would have to take into consideration that Claimant could not operate dangerous equipment or climb ladders and should not work in a solitary environment, noting that stress and fatigue could exacerbate his seizure disorder causing him to be a hazard to himself and/or other employees. (*Id.*).

## VI. <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed

applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. <u>Discussion</u>

### A. *The ALJ's Analysis of Claimant's Credibility*

In his first challenge to the Commissioner's decision, Claimant argues that the ALJ failed to consider the change in his symptoms over time when evaluating his credibility, as required by SSR 96-7p.[1] Consequently, Claimant contends that the ALJ's credibility determination is unsupported by substantial evidence. (ECF No. 12 at 4-5).

An ALJ evaluates a claimant's report of symptoms using a two-step process. First, the ALJ must assess whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016). Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological

---

[1] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which Claimant relied on in his brief. The undersigned finds it appropriate to consider Claimant's challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 404.1529(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* § 404.1529(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. § 404.1529(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *Id.* § 404.1529(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* § 404.1529(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7.

In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited
> solely because they are not substantiated by objective evidence of the pain
> itself or its severity, they need not be accepted to the extent they are

> inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595).

The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5. SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. However, the Ruling provides that "inconsistencies in an individual's statements made at varying times does not necessarily mean they are inaccurate;" rather, "[s]ymptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time," which "may explain why an individual's statements vary when describing the intensity, persistence, or functional effects of symptoms." *Id.*

Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow

prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person;" rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

Critically, when considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these

questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ considered Claimant's statements using the two-step process required by the ruling and regulations. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 25). Second, the ALJ evaluated Claimant's allegations, treatment records, diagnostic testing results, and Claimant's own statements which the ALJ concluded contradicted some of his allegations. (Tr. at 25-27). Ultimately, based on her analysis of all of the evidence, the ALJ found that Claimant's statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*). Claimant points to four specific areas in which he contends that the ALJ's credibility analysis is flawed, including the ALJ's analysis of his neck and shoulder pain, chest pain with shortness of breath, and seizures, as well as the ALJ's analysis of the treatment modalities that he received. (ECF No. 12 at 4-5).

Beginning with Claimant's first argument, Claimant contends that the ALJ erred by not considering how his neck and shoulder pain changed over time. (ECF No. 12 at 4). The ALJ noted Claimant's testimony that he had "continuous pain in his neck and shoulder" and felt that his spinal column "was ripped out if he lifted anything or raised his arm." (Tr. at 26). Yet, the ALJ found that no objective evidence supported those claims. (*Id.*). For instance, the ALJ cited that during an October 2012 clinical visit with Dr. Mazagri, Claimant reported that he had not taken any pain medications lately. (*Id.*). Further, the ALJ cited diagnostic testing of the cervical spine, which revealed "only mild degenerative changes and no evidence of disc herniations or severe stenosis." *(Id.)*. The ALJ also referenced an x-ray of Claimant's left shoulder, which showed "only mild

degenerative change of the acromioclavicular joint with no evidence of acute fracture or misalignment." (*Id.*). Additionally, the ALJ noted that while Claimant stated in a Pain Questionnaire that his pain medications provided only occasional relief at times, he noted during treatment that his neck pain was somewhat alleviated with the use of Lyrica and Norco. (*Id.*).

Although Claimant's argument states that the ALJ failed to consider and address how Claimant's symptoms *changed over time*, Claimant's discussion of his shoulder and neck pain instead focuses on a single October 18, 2012 visit. Claimant fails to articulate or provide any explanation as to how his symptoms changed over time such that the ALJ was remiss in not considering changes in his symptoms. (*Id.*). Instead, Claimant points to several notations from the October 2012 visit in an effort to cast doubt on the ALJ's findings. Claimant's argument is unavailing. First and foremost, the ALJ clearly considered any extent to which Claimant's neck and shoulder pain "changed over time." In her decision, the ALJ not only discussed the above-referenced October 2012 visit, but she cited and discussed Claimant's diagnostic testing from 2012, 2013, and 2014. (Tr. at 26).

Furthermore, the ALJ's analysis of the evidence is supported by substantial evidence. In September 2012, Claimant had a MRI of his cervical spine to evaluate his complaint of neck pain radiating to his left shoulder. (Tr. at 361). He had mild degenerative changes similar to his previous study in March 2010. (*Id.*). The cervical vertebral body and disc heights were well-maintained, the prevertebral soft tissues were within normal limits, and there was no evidence of severe stenosis. (*Id.*). In May 2013, Claimant had an x-ray of his shoulder to evaluate his complaints of pain radiating from his neck into his shoulder; he had mild spondylosis, but no acute findings. (Tr. at 353).

Further, in September 2014, his MRI showed no change in his cervical radiculopathy since 2012. (Tr. at 432). Therefore, the undersigned is not in the position to second-guess, reweigh, or substitute her analysis for the ALJ and must affirm the ALJ's decision as to this challenge raised by Claimant. Accordingly, the undersigned **FINDS** that Claimant's argument that the ALJ erred by not considering how his neck and shoulder pain changed over time is without merit.

Claimant next argues that the ALJ similarly failed to evaluate how his chest pain and shortness of breath changed over time when assessing his credibility. In her decision, the ALJ stated that despite Claimant's complaints of continued severe chest pain and shortness of breath from coronary artery disease, his treatment records from Dr. Gunnlaugsson in October 2012 and January 2014 reflect statements by Claimant that he was doing well. He denied exertional chest discomfort. (Tr. at 26). Claimant contends that this finding is erroneous because Claimant's cardiologist noted that he had Prinzmetal angina in addition to coronary artery disease, which is a variant of angina that occurs at rest rather than during exercise. (ECF No. 12 at 5).

Substantial evidence supports the ALJ's credibility analysis as to Claimant's chest pain and shortness of breath. Claimant had a coronary intervention in 2007 with a bare-metal stent. (Tr. at 319). He did not return to his cardiologist Dr. Gunnlaugsson for several years. (Tr. at 315). In October 2011, Claimant complained to Dr. Gunnlaugsson that he began having exertional chest pain a month prior. (*Id.*). An EKG and cardiac examination were normal. (*Id.*). Claimant's chest pain was suggestive of an unstable angina, but his heart catheterization the following week revealed stability. (*Id.*). In October 2012, during a neurosurgery consultation, he denied cardiovascular issues or chest pain. (Tr. at 296 and 298). That month, Claimant also saw Dr. Gunnlaugsson and reported doing "very

well." (Tr. at 319). He had not experienced *any* anginal chest pain, other than one episode four months earlier that was relieved by taking a Nitroglycerin pill. (*Id.*). His EKG was normal and TriCor was providing good results in lowering his triglycerides. (*Id.*). In January 2014, Dr. Gunnlaugsson noted that Claimant was doing well overall. (Tr. at 321). Claimant reported sometimes experiencing chest pain when he had back and neck pain. (*Id.*). Dr. Gunnlaugsson stated that his chest pain was probably related to his back discomfort and noted that Claimant had no exertional chest discomfort. (*Id.*). Also, during his internal medicine examination in February 2014, although Claimant reported having chest pain three times per week, he stated that it subsided on its own or he took Nitroglycerin which provided relief within minutes. (Tr. at 366).

Although Claimant's cardiologist noted his Prinzmetal's angina, he also specifically referenced within the same records that Claimant denied exertional chest pain; considering that Claimant's cardiologist felt compelled to document on multiple occasions that Claimant had no pain on exertion, the lack of such pain was obviously relevant to his diagnosis and treatment. Claimant's suggestion that the ALJ erred in noting this factor is unpersuasive. Overall, as shown above, the evidence supports the ALJ's conclusion that Claimant's records fail to fully substantiate his allegations regarding chest pain and shortness of breath. Despite his complaints of chest pain, his cardiologist repeatedly stated that he was doing well. This Court is not tasked with performing its own credibility analysis; rather, the Court must only determine if the evidence is sufficient to support the ALJ's conclusions. Here, the record very reasonably supports the ALJ's findings as to Claimant's credibility regarding his chest pain and shortness of breath. Therefore, the undersigned **FINDS** that Claimant's claim that the ALJ did not properly evaluate his chest pain and shortness of breath in assessing his

credibility is without merit.

Further, the undersigned considered Claimant's argument that the ALJ failed to account for changes in Claimant's seizure disorder. The ALJ found that despite Claimant's claim that he suffered from uncontrollable epilepsy and received no benefit from seizure medications, the record contained no evidence of emergency room visits for seizure activity and his treatment records reflected that he received fair relief from Keppra and Tegretol. (Tr. at 26). In his brief, Claimant contends that he "suffered from seizures since he was a child and knew what to expect." (ECF No. 12 at 5). However, it is unclear how that point relates to Claimant's argument that the ALJ failed to consider changes in his symptoms over time. Claimant does not identify any evidence that shows a change in his seizure disorder, or that effectively undermines the ALJ's credibility analysis.

In 1997, Claimant's seizure disorder was improving with the use of Topamax and other medications; he was down to three seizures per month. (Tr. at 415-19). In September 2014, Claimant's neurologist Dr. Lewis noted that he had fair results from medication for his complex partial seizures. (Tr. at 428). Claimant stated that he continued to have seizures up to five times per week, but declined Dr. Lewis's offer to increase his medications or obtain additional testing. (Tr. at 432). Therefore, the undersigned **FINDS** that substantial evidence supports the ALJ's credibility analysis regarding Claimant's epilepsy.

Finally, the undersigned addresses Claimant's argument that the ALJ failed to consider changes in Claimant's modalities of treatment when analyzing his credibility. In her decision, one of the final factors that the ALJ cited in support of her finding that Claimant was not fully credible is that the "record also contains no evidence of alternate treatment modalities such as physical therapy or chiropractic manipulation other than

narcotic pain medications ..." (Tr. at 26). Claimant argues that this statement is factually inaccurate because Drs. Lewis and Mazagri stated that Claimant was unsuccessfully treated with physical therapy. (ECF No. 12 at 5). Nevertheless, while Drs. Lewis and Mazagri referenced that Claimant received physical therapy, there is no evidence that he received physical therapy **_during the relevant period_**, which is the only period addressed by the ALJ's statement.

In 2000/2001, Claimant's neck was injured in an assault by a nursing home patient at Claimant's place of employment. (Tr. at 365, 428). Claimant explained to Dr. Parsley during the internal medicine consultative examination that, after the injury, he took off work for one year and received physical therapy and chiropractic treatments, which were unsuccessful in relieving his symptoms. (_Id._). Thus, while there is evidence indicating that Claimant had physical therapy and chiropractic care in 2000/2001, there is no evidence that Claimant received additional physical therapy or chiropractic care during the decade after his initial post-injury treatment. Indeed, the record reviewed by the ALJ contained no treatment or consultative notes from a physical therapist or chiropractor. There were no documented referrals to either of those specialties, no letters or reports from specialists in those fields, no orders of any kind, and no other documentation to substantiate that Claimant received physical therapy or chiropractic services prior to, around, or after the date of his disability onset in October 2012.

Although Dr. Mazagri stated in October 2012 that Claimant was "being treated with physiotherapy with continuation of symptomology," this single notation is insufficient to render the ALJ's credibility analysis unsupported by substantial evidence or to warrant remand of this action, because the statement is unsubstantiated by any of the other records. (Tr. at 298). In fact, the weight of the evidence supports the ALJ's finding. The

opinion letters from Claimant's physicians in 2013 through 2015 state that Claimant was treated with medication; they do not reference physical therapy or chiropractic treatments at all. (Tr. at 303, 386, 396). The report of Claimant's internal medicine consultative examination suggests that the only physical therapy and chiropractic care he received was shortly after his assault in 2000/2001. That consultative report is also consistent with Claimant's testimony at the administrative hearing in which he stated that he was "off work for over a year" and had to do "physical rehabilitation." (Tr. at 46, 365). Moreover, in applying for disability, Claimant did not list any chiropractors or physical therapists among his medical providers, did not identify any such treatment, and did not submit any records documenting that type of care. (Tr. at 216-18, 248-49, 274-76).

Therefore, while the ALJ's statement that "the record also contains no evidence of alternate treatment modalities such as physical therapy or chiropractic manipulation" is perhaps poorly worded given Claimant's remote history of those alternate modalities of treatments, the ALJ's finding is correct when viewed in the context of the time frame relevant to the disability determination. Accordingly, the undersigned **FINDS** that the ALJ's credibility analysis regarding the treatment modalities that Claimant received is supported by substantial evidence.

### B.    *The ALJ's Consideration of the Treating Physicians' Opinions*

In his second challenge, Claimant contends that the ALJ failed to seek clarification of the opinions of his treating physicians that his epilepsy would affect his ability to perform work on a full time basis, which Claimant states was required by SSR 96-5p. (ECF No. 12 at 6). Within this challenge, Claimant argues that the ALJ failed to consider that stress and fatigue were limiting factors in his RFC, as they could exacerbate his seizure disorder, and that the ALJ did not consider his post-seizure headaches and weakness.

(*Id.*).

First, the undersigned addresses Claimant's argument that the ALJ discounted the impact of stress and fatigue on his RFC. The ALJ expressly stated in her decision that she gave great weight to the "seizure precautions" provided by Drs. Houdersheldt and Lewis and adopted them in Claimant's RFC, including the restriction that Claimant should not work in a solitary environment because stress and fatigue could exacerbate his seizure disorder. (Tr. at 28). The RFC finding explicitly limits Claimant to no solitary work. (Tr. at 24). Further, the ALJ correctly included this limitation in the hypothetical posed to the vocational expert during Claimant's administrative hearing. The expert responded that an individual with a restriction to "no solitary work" could work as a routing clerk at the light exertional level and an inspector at the sedentary level. (Tr. at 74-76). Likewise, the expert stated that such positions are "low stress jobs" and could be performed by someone who is limited to low stress work. (Tr. at 78). The ALJ relied on that testimony in finding that Claimant could work in those occupations despite his restrictions. Therefore, the undersigned **FINDS** that there is no merit to Claimant's argument that the ALJ discounted the impact of stress and fatigue on his RFC.

Turning to Claimant's remaining arguments, Claimant asserts that the ALJ should have sought clarification from his treating physicians regarding the effect of his epilepsy on his ability to perform work on a full time basis. (ECF No. 12 at 6). Claimant states that the ALJ did not consider the fact that he had post-seizure weakness and headaches. (*Id.*). There are three letters in the record from Claimant's medical providers stating that he could not work due to seizures and other conditions. In November 2013, Claimant's primary care provider, Dr. Houdersheldt, authored a letter listing Claimant's diagnosed conditions, including "seizures;" noting that he suffered from other issues such as

"frequent severe headaches;" and stating that "although [Claimant] previously tolerated pain with medication, as the condition has progressed it is my professional opinion [that he] is no longer able to work." (Tr. at 303). In September 2014, Claimant's neurologist, Dr. Lewis, authored a letter similarly stating Claimant's diagnosed conditions, including "Intractable epilepsy;" noting his "other issues," including, *inter alia*, "frequent headaches;" and stating that in his opinion Claimant was "not capable of working a forty hour week and should be considered for permanent disability." (Tr. at 386). Finally, in August 2015, Dr. Houdersheldt provided another letter in connection with Claimant's disability claim, stating Claimant's "psychomotor seizures" were Dr. Houdersheldt's main concern at the time and noting Claimant's diagnosis of frequent headaches, among other issues. (Tr. at 396). Dr. Houdersheldt stated that Claimant was "not capable of working a full time job" and that "[w]orking a forty-hour week should be considered a permanent restriction." (*Id.*). Dr. Houdersheldt then provided specific restrictions based on Claimant's seizure disorder, including stating that Claimant should not operate dangerous equipment, climb ladders, or work in a solitary environment. (*Id.*).

Medical source opinions on issues reserved to the Commissioner, including opinions that a claimant is disabled, are not entitled to special significance. 20 C.F.R. § 404.1527(d)(1) (2012). Nevertheless, Social Security Ruling 96-5p provides guidance that an ALJ must "recontact" a treating source for clarification on issues reserved to the Commissioner when "the evidence does not support a treating source's opinion on any issue reserved to the Commissioner ***and the adjudicator cannot ascertain the basis of the opinion from the case record*.**" SSR 96-5p (emphasis added). Moreover, the applicable regulation in effect at the time of the ALJ's decision provided that an ALJ "may" contact a treating source if the evidence is consistent, but there is

insufficient evidence to determine whether the claimant is disabled, or if after weighing the evidence, the ALJ cannot reach a conclusion about whether the claimant is disabled. 20 C.F.R. § 404.1520b(c) (2012).[2]

Claimant does not identify any gap in the record evidence that would have prompted or required the ALJ to seek additional information or clarification from Claimant's treating sources. The ALJ considered, but appropriately gave no weight to Drs. Houdersheldt's and Lewis's opinions that Claimant was disabled. (Tr. at 27-28). In contrast, the ALJ gave signifcant weight to the functional restrictions that the physicians identified related to Claimant's epilepsy and adopted such restrictions in Claimant's RFC finding. (*Id.*). Drs. Houdersheldt's and Lewis's opinion letters and treatment records make clear the basis for their opinions that Claimant was unable to work. Their letters list Claimant's diagnoses and restrictions and their treatment records further elaborate, detailing Claimant's diagnoses and alleged symptoms, the clinical and objective findings, and the specifics of his treatment regarding his epilepsy and other conditions. As such, it does not appear that any additional clarification of their opinions was warranted.

Further, Claimant argues that the ALJ neglected to consider his post-seizure weakness and headache "which is both typical and should be taken into consideration." (ECF No. 12 at 6). It is again uncertain how this point relates to Claimant's argument that the ALJ should have contacted Claimant's treating sources for additional information or

---

[2] Notably, as discussed in the Commissioner's brief, the regulations were revised to allow an ALJ discretion in determining whether to recontact a treating source. In 2012, 20 C.F.R. § 404.1512(e) was eliminated, which stated that the SSA would recontact a medical source in certain specified circumstances. The revised regulations provided that an ALJ "may" elect to recontact a treating source to obtain additional information or clarification, but was under no obligation to do so. 20 C.F.R. § 404.1520b(c) (2012). Likewise, under the current version, which was not yet in effect at the time of the ALJ's decision, an ALJ "may" choose to recontact a treating source in the case of incomplete or inconsistent evidence, but is not required to do so. 20 C.F.R. § 404.1520b(b) (2017).

clarification regarding their medical source statements. In any event, as discussed, the ALJ analyzed the objective and opinion evidence regarding Claimant's seizure disorder. The ALJ recognized Claimant's and his wife's allegations that he is "out of it" and suffers a throbbing headache and disorientation for hours after a seizure. (Tr. at 25-26). Nonetheless, the ALJ did not find Claimant's allegations to be fully credible for numerous reasons, including the fact that Claimant never required emergency treatment due to seizures and that his treatment records reflected that he received fair relief from Keppra and Tegretol. (Tr. at 26).

In sum, the undersigned **FINDS** that there are no ambiguities, inconsistencies, or gaps in information, which would have prompted the ALJ to seek additional information or clarification from Claimant's treating physicians regarding their opinions that Claimant could not work, much less obligated her to seek such clarification. Therefore, the undersigned does not find any merit to Claimant's second challenge to the Commissioner's decision.

## VIII.   <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 12); **GRANT** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code,

Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** May 8, 2017

Cheryl A. Eifert
United States Magistrate Judge